UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.W., on behalf of her minor daughter, A.W.,

                              Plaintiff,

        - against -                                                **OPINION AND ORDER**

BOARD OF EDUCATION OF THE ENLARGED                     12 Civ. 1476 (ER)
CITY SCHOOL DISTRICT OF MIDDLETOWN,
NEW YORK,

                              Defendant.

Ramos, D.J.:

        Plaintiff M.W. (the "Parent") on behalf of her daughter, A.W. (the "Student"), brings this

action against the Board of Education of the Enlarged City School District of Middletown, New

York ("Defendant" or the "District") under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking to overturn the decision of the State Review Officer

("SRO") that the District is not required to reimburse the Parent for her unilateral placement of

A.W. at the Franklin Academy ("Franklin") for a portion of the 2009-2010 school year and the

entirety of the 2010-2011 school year.  The parties have filed cross-motions for summary

judgment.  Docs. 10, 14.  For the reasons set forth below, Plaintiff's Motion for Summary

Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

**I. Statutory Framework**

        Congress enacted the IDEA to encourage the education of children with disabilities.

*E.A.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (S.D.N.Y. Sept.

29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute, any state

receiving federal funds must provide a free appropriate public education ("FAPE") to disabled

children.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 180-81.  Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 123 (2d Cir. 1998).

To satisfy its obligation, the FAPE provided by the State must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207.  These services must be administered in accordance with an Individualized Education Plan ("IEP"), which school districts must have in place at the beginning of each school year.[1]  *See* 20 U.S.C. § 1414(d)(2)(A).  An IEP is a written statement, collaboratively developed by the parents, educators, and specialists, that "'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  *D.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 508 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)), *amended on denial of rehearing by* 480 F.3d 138 (2d Cir. 2007); *see also* 20 U.S.C. § 1414(d)(1)(A)(i) (defining "IEP").

In New York, the task of developing an IEP rests with the local Committee on Special Education ("CSE"), whose members are appointed by the board of education or trustees of the school district.  N.Y. Educ. Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992).  "In developing a child's IEP, the CSE is required to consider four factors: '(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'"  *E.A.M.*, 2012 WL 4571794, at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).  The IEP

---

[1] As a matter of New York State Law, the school year runs from the first day of July in each year through June 30 of the following calendar year.  N.Y. Educ. Law § 2(15).

must be "reasonably calculated to enable the child to receive educational benefits, . . . likely to produce progress, not regression, and [] afford[] the student with an opportunity greater than mere trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks and citations omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *id.* (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted).

The IDEA requires a school district to review a child's IEP "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved," 20 U.S.C. § 1414(d)(4)(A)(i), and to revise a student's IEP  "as appropriate."  20 U.S.C. § 1414(d)(4)(A)(ii); *see also* 20 U.S.C. § 1414(d)(3)(D)—(d)(3)(F) (regarding the process for making changes to a child's IEP after the annual IEP meeting for a school year).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an impartial hearing officer ("IHO") appointed by a local school board of education.  *See* N.Y. Educ. Law § 4404(1)(a).  The decision of the IHO may be appealed to a SRO, *see* N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. § 1415(g), and the SRO's decision may be challenged by any aggrieved party in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).  When reviewing the SRO's decision, a district court "shall receive the records of the administrative proceedings," and "hear additional evidence at the request of a party."  20 U.S.C. § 1415(i)(2)(C)(i-ii).  The district court shall then "grant such relief as the court determines is appropriate," based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).  Under

the statute, appropriate relief may include reimbursement for the cost of a private school

placement.  *E.A.M.*, 2012 WL 4571794, at *2 (citations omitted).

## II. Factual Background[2]

A.W., currently eighteen years old, has been classified as learning disabled since

kindergarten.  Tr. 62, 522.  The Student's classification is not in dispute.  In this action, the

Parent challenges the SRO's decision that the District provided A.W. with a FAPE for the 2009-

2010 school year, including the portion of the year when A.W. attended Franklin Academy

("Franklin"), and the SRO's finding that Franklin was not an appropriate placement for A.W. for

the 2010-2011 school year.

### A. Educational History

#### 1. 2005-2006 School Year

The earliest IEP contained in the administrative record relates to a CSE Program Review

meeting for the 2005-2006 school year, which was held on July 27, 2005.  D. Ex. 2.  At that

time, A.W. was enrolled in a twelve month program at Green Chimneys, a special day school,

in accordance with a previous placement recommendation by the CSE.  *Id.* at 1-2.  According

to the Parent, A.W. attended Green Chimneys for approximately two years.  *See* Tr. 523; *see*

*also* P. Ex. F, at 3.

The amended IEP that was developed at the July 27, 2005 CSE meeting indicates that

A.W., who was in the sixth grade, was working with a 1:1 teaching assistant within a combined

---

[2] The Court has reviewed the administrative record provided by the parties.  The following facts are drawn from the
transcripts of the testimony heard by the IHO, exhibits introduced at the IHO hearing, and the decisions of the IHO
and SRO.  Citations to "Tr." refer to the transcript of the impartial hearing conducted on five nonconsecutive days
between August 31, 2010 and August 10, 2011.  Citations to "D. Ex." refer to exhibits submitted by the District
during the impartial hearing.  Citations to "P. Ex." refer to exhibits submitted by the Parent during the impartial
hearing.  Citations to "IHO Ex." refer to exhibits marked by the IHO at the impartial hearing.  Citations to "IHO
Dec." refer to the October 10, 2011 Impartial Hearing Decision.  Whateley Aff. Ex. B, Doc. 13-2.  Citations to
"SRO Dec." refer to the December 15, 2011 Decision of the SRO.  Whateley Aff. Ex. A, Doc. 13-1.

16:2:2 special class setting, in which the Student had been placed by the school.  D. Ex. 2, at 1.

A.W. was also receiving related services of individual counseling for thirty minutes once a

week, individual occupational therapy for thirty minutes twice a week, 3:1 occupational

therapy for thirty minutes once a week, individual physical therapy for thirty minutes once a

week, and individual vision services for thirty minutes twice a week.  *Id.* at 2.  Additionally,

A.W. required daily access to a word processor and a number of testing accommodations.  *Id.*

at 2.

 According to the IEP, A.W.'s cognitive ability was measured in the average to superior

range, but A.W. had a "significant delay in math calculation, math concepts, written

expression, [and] social skills, which inhibit[ed] participation in age appropriate activities."  *Id.*

at 3.  In the area of social development, the IEP indicates that A.W. had a "difficult time

regulating anger and frustration when things don't go her way," a "very difficult time accepting

limits and consequences for negative behavior," and that A.W. could "become extremely

verbally abusive when she does not get her way, often threatening staff and making up

elaborate lies about teacher and other supportive staff."  *Id.* at 4.  In the area of physical

development, the IEP notes the Student's "difficulties with fine motor coordination,

handwriting, bimanual coordination, gross motor coordination, [and] processing and

modulating sensory information."  *Id.*

 The discussion at the July 27, 2005 CSE Program Review meeting resulted in a

recommendation that A.W. be placed in an 8:1:1 special class setting with an individual aide.

*Id.* at 1.  The CSE also recommended that related services continue "per the student's current

IEP."  *Id.*

On November 1, 2005, the CSE convened at the Parent's request to conduct another Program Review for the 2005-2006 school year. D. Ex. 1, at 1. According to the IEP, M.W. had requested that the CSE consider a different school placement for A.W. *Id.* After a lengthy discussion, the CSE recommended a residential placement for A.W., because of her "inconsistent progress" at Green Chimneys. *Id.* The IEP developed at the November 1, 2005 CSE meeting indicates that A.W. was to remain at Green Chimneys "pending placement in a more structured setting." *Id.*

On November 23, 2005, a Subcommittee on Special Education ("SCSE") convened for another Program Review for the 2005-2006 school year.[3] *See* D. Ex. 3. According to the IEP developed at the meeting, A.W. had been accepted at Devereux-Glenholme ("Glenholme"), *id.* at 1, an out-of-state nonpublic residential school which had been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. *See* N.Y. Comp. Codes R. & Regs. tit. 8, §§ 200.1(d), 200.7. Accordingly, the CSE recommended a twelve-month residential placement at Glenholme with a special 12:1:1 class setting. D. Ex. 3, at 1. The CSE also recommend related services of individual counseling for sixty minutes once a week, individual occupational therapy for thirty minutes twice a week, and 5:1 occupational therapy for thirty minutes once a week. *Id.* at 1, 2.

---

[3] Pursuant to New York State Regulations promulgated by the Commissioner of Education, city school districts are required or permitted (depending on the population of the city) to appoint SCSEs "to the extent necessary to ensure timely evaluation and placement of students with disabilities." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(c). The membership of such a subcommittee is substantially similar to the membership of a Committee on Special Education. *See id.* § 200.3(a)(1) (listing required members for CSEs); *id.* § 200.3(c)(2) (listing required members for SCSEs). A SCSE "may perform the functions of the [CSE] pursuant to the provisions of Education Law, section 4402, except when a student is considered for initial placement in: (i) a special class; or (ii) a special class outside of the student's school of attendance; or (iii) a school primarily serving students with disabilities or a school outside of the student's district." *Id.* § 200.3(c)(4). Since the distinction between the CSE and SCSE is immaterial for purposes of resolving the pending motions, the Court refers to both entities as the "CSE" in this opinion.

A.W. began attending Glenholme on December 12, 2005.  *Id.* at 2.  A discharge report prepared by Glenholme on June 1, 2010 indicates that A.W. was placed at Glenholme to address "oppositional behavior, poor social skills, verbal aggression, tantrums, poor self control, lying, anxiety, attention problems, challenging authority, social isolation, and parent/child conflicts."  D. Ex. 10, at 1; *see also* Tr. 523-25.

On June 13, 2006, the CSE convened for another Program Review for the 2005-2006 school year.  D. Ex. 5.  According to the Meeting Minutes, A.W.'s teachers reported that she "continue[d] to do well in school," and that she was "beginning to settle in to the routine of the program" at Glenholme.  *Id.* at 1.  After reviewing an assistive technology evaluation, the CSE made various recommendations regarding new supplementary services and assistive technology devices/services.  *Id.*  The Meeting Minutes state:  "No changes are made to [A.W.'s] program at this time."  *Id.*

### 2.  2006-2007 School Year

On March 22, 2006, the CSE convened to conduct another Program Review for the 2005-2006 school year, and an Annual Review for the 2006-2007 school year.  *See* D. Ex. 4. The IEP developed for the 2006-2007 school year indicates that A.W. had "adjusted well to [the] program" at Glenholme, but that she continued to struggle with multiple step directions, organizational skills, and various behavioral problems.  *Id.* at 1.  Additionally, the IEP indicates that A.W., who was in the sixth grade, was performing at a fourth grade math level. *Id.*  The CSE determined that a 12:1:1 special class setting at Glenholme continued to be appropriate for the 2006-2007 school year with related services of individual counseling for sixty minutes once a week and individual occupational therapy for sixty minutes once a week. *Id.* at 1-2.  The Student's IEP for the 2006-2007 school year also included various

supplementary aids, assistive technology devices/services and testing accommodations. *Id.* at 2-3.

### 3.   2007-2008 School Year

On May 2, 2007, the CSE convened to conduct an Annual Review for the 2007-2008 School Year.  D. Ex. 6.  The Comments section of the IEP indicates that A.W. had made "slow, steady gains" behaviorally, but that certain behavioral issues persisted.  *Id.* at 1.  A Glenholme treatment plan for the period April 2008-April 2009, which includes a list of inappropriate behaviors exhibited by A.W. in March 2008, indicates that A.W. continued to struggle with a number of behavioral problems throughout the 2007-2008 school year.  *See* D. Ex. 17, at 22.[4]

Academically, A.W. was functioning at grade level in reading, but "[m]ath continue[d] to be an area of delay," which was reportedly a source of frustration for the Student.  D. Ex. 6, at 1.  The IEP states, however, that "the student's frustration has decreased over the school year through [the] use of various modifications utilized so the student does not become overwhelmed."  *Id.*  The IEP also indicates that A.W.'s use of medication had decreased.  *Id.* Additionally, A.W. had made "significant progress" in occupational therapy.  *Id.*

As a result of the May 2, 2007 Annual Review, the CSE recommended that the Student's twelve-month residential placement at Glenholme in a special 12:1:1 class setting and related services of individual counseling for sixty minutes once a week and individual occupational therapy for thirty minutes once a week continue for the 2007-2008 school year.  *Id.* at 1-2. A.W.'s IEP for the 2007-2008 school year also includes various program modifications,

---

[4] A.W.'s treatment plan at Glenholme for the period April 2008-April 2009 included behavioral objectives to decrease the frequency of the following inappropriate behaviors:  "talking down to peers, interrupting, tattling, accusing others of picking on her, asking repeated questions, pouting/whining/crying, bossing others, yelling/screaming, arguing/talking back, poor tone of voice (rude/condescending), making excuses, [and] overreacting to situations."  D. Ex. 17, at 22.

assistive technology devices/services and a number of testing accommodations.  *Id.* at 2-3.

Additionally, the CSE referred the Student for a speech language evaluation "to assess the need

for therapy in pragmatics."  *Id.* at 1.

The report of the Pragmatic and Spoken Language Evaluation, which was conducted on

November 5, 2007, indicates that A.W. had received informal speech/language therapy

services on a weekly basis since her admission to Glenholme in 2005.  D. Ex. 15, at 1.  The

report also notes that A.W. was attending a "social communication skills group with female

peers once a week to address her needs in the areas of pragmatic language, social problem

solving, and conflict resolution."  *Id.*  The results of the evaluation "suggest[ed] mild

difficulties in the area of pragmatic language that are exacerbated by [A.W.'s] emotional and

behavioral challenges."  *Id.* at 3.  Based on the results of the testing, A.W. did not qualify for

direct speech/language therapy services; however, the speech/language pathologist who

conducted the evaluation recommended that A.W. "continue to be involved in structured group

activities to learn and practice strategies for social awareness and problem solving, conflict

resolution, and communicative competence."  *Id.*  The report notes that A.W. "continue[d] to

benefit from the social teaching and structure provided by the Glenholme School, from the

numerous classroom modifications and accommodations, and from her participation in the

social-communication skills group."  *Id.*

On June 12, 2008, the Glenholme school psychologist performed a psycho-educational

evaluation of A.W.  D. Ex. 16.  According to the report of the evaluation, A.W. had been

referred for assessment by the District's Planning and Placement Team for the purpose of

determining her cognitive strengths and weakness, and how those strengths and weaknesses

affected her academic performance.  *Id.* at 1.  In order to assess the Student's cognitive

functioning, the Weschler Intelligence Scale for Children, Fourth Edition ("WISC-IV") was administered.  *Id.*  The WISC-IV yields a Full-Scale intelligence ("IQ") score that reflects a student's combined performance on 10 subtests and provides a composite measure of the student's verbal and nonverbal skills.  *Id.*  A.W. obtained a Full-Scale IQ of 89, which measured within the low average range.  *Id.* at 2.  The examiner noted that A.W. demonstrated variability across the subtests that comprise the Full-Scale IQ; for example, A.W.'s verbal expression and comprehension skills were described as "significantly more developed than her short-term auditory memory, visual scanning speed, and visual motor integration skills."  *Id.*  According to the report, the test results indicated that the Student was functioning "within the low average range of intelligence."  *Id.* at 3.

As a result of the cognitive assessment, the examiner recommended, *inter alia*, teaching styles that "accent [A.W.'s] significant verbal comprehension and verbal expression strengths," the consistent use of an assignment pad, planner or device to record daily assignments, and providing A.W. with models and samples on tasks requiring visual/spatial relationship skills.  *Id.*

### 4.  2008-2009 School Year

a.  <u>2008-2009 IEP</u>

The IEP that was developed by the CSE for the 2008-2009 school year is not among the documents in the administrative record; however, an IEP from a March 4, 2009 Program Review meeting indicates that, for the 2008-2009 school year, A.W. remained in the twelve-month residential placement at Glenholme with related services of individual counseling for sixty minutes once a week and individual occupational therapy for thirty minutes once a week.  D. Ex. 7, at 1-2.  Additionally, according to a Glenholme annual update dated March 4, 2009,

A.W. "continued to receive speech/language therapy services on an informal basis within the context of a collaboratively facilitated social communication skills group," as well as structured group lessons and "social coaching throughout the day in every aspect of Glenholme's program."  D. Ex. 17, at 21.

As a result of the discussion at the March 4, 2009 CSE meeting, three program modifications were added to the IEP:  a copy of class notes, preferential seating, and shortened material on pages.  D. Ex. 7, at 1, 2.  As in prior years, the IEP for the 2008-2009 school year included a program modification of access to graph paper, as well as a recommendation regarding two assistive technology devices, and a number of testing accommodations.  *Id.* at 2. Apart from the three new program modifications, the CSE recommended that A.W.'s program and related services remain the same.  *Id.* at 1.  The IEP states that M.W. was in agreement with the CSE's recommendations.  *Id.*

  b.  Academic Performance

According to the IEP from the March 4, 2009 CSE meeting, A.W.'s teachers described her as "a good student who is motivated and works hard at all academic tasks presented," but noted that she continued to perform below grade level in math and failed to demonstrate grade-appropriate organizational and study skills.  *Id.* at 1, 4.  The reports of A.W.'s academic performance provided by her teachers at a May 20, 2009 CSE meeting were largely the same. *See* D. Ex. 8, at 1.

A Glenholme teacher report prepared by A.W.'s math teacher in May 2009 indicates that she continued to receive instruction at an eighth grade level, and that she also required "modified work, with a significant amount of review and extra practice."  D. Ex. 17, at 9.  The math teacher's March 2009 report indicates that A.W. required extra help on several occasions,

but she had declined the teacher's recommendation that A.W. attend "math help" one day per week.  *Id.* at 17.  The math teacher's report states that A.W. was "working very hard in math," but was "putting a considerable amount of pressure on herself and [was] displaying characteristics of stress including rambling, short outbursts, and irritability."  *Id.*  The report also states that A.W.'s preoccupation with her placement in pre-Algebra, rather than Algebra, hindered her progress in the class.  *Id.*

A Glenholme report card for the 2008-2009 school year shows that A.W. received grades of As and Bs in all of her academic subjects for both effort and achievement, and that she was on the honor roll for each of the four quarters of the 2008-2009 school year.  D. Ex. 12, at 1-2.

c.  Behavioral Progress

The Glenholme treatment plan for the April 2008-April 2009 period indicates that, as of February 2009, A.W. continued to exhibit the twelve inappropriate behaviors identified as problematic in March 2008, *see supra* note 4, as well as two newly identified inappropriate behaviors that were added her current treatment plan and to the treatment plan for the March 2009-March 2010 period.[5]  D. Ex. 17, at 22-23.  The February 2009 report summary states: "[w]ith regards to the twelve familiar behavioral objectives; three have increased in frequency, two have decreased in frequency and seven have remained consistent in frequency [sic] since her review last year."  *Id.* at 24.

At the March 4, 2009 CSE meeting, A.W.'s teachers reported "a decrease in negative behaviors," and noted that A.W. was not taking any medications and was "doing well."  D. Ex. 7, at 1.  In the area of social development, the IEP states that A.W. had "made a good

---

[5] The two newly identified inappropriate behaviors were "seeking excessive attention" and being "overly involved in peer issues."  D. Ex. 17, at 22-23.

adjustment to the school environment," but notes that A.W. needed to "increase [her] ability to cope with frustration," and "to develop age appropriate social/emotional skills with peers." *Id.* at 4. At the May 20, 2009 CSE Annual Review, A.W.'s teachers reported that she continued to exhibit inappropriate behaviors such as "interrupting and tattling" several times a week, but noted that A.W. had shown improvement with respect to several other inappropriate behaviors. D. Ex. 8, at 1. The IEP developed at the May 20, 2009 CSE meeting indicates that A.W. continued to struggle with coping skills, changes in environment, and appropriately handling frustrations, but that a "token economy"[6] was being employed with success. *Id.* The IEP also indicates that A.W. had started the "self-dependent process" in Glenholme's behavioral program, which she seemed to enjoy. *Id.* The Student was described as "positively engaged in the program." *Id.* A.W. was also making steady progress in occupational therapy. *Id.*

A Glenholme School Review Progress Update, dated May 20, 2009, indicates that A.W. continued to struggle with all fourteen of the inappropriate behaviors included in her March 2009-March 2010 treatment plan, and that the frequency of most of the behaviors had not changed since the March 2009 review. D. Ex. 17, at 13.

---

[6] During the impartial hearing, Dr. Queenan explained that the "token economy" utilized by Glenholme is a positive behavior support model comprised of three levels in which students earn tokens for achieving certain specified behavioral and/or social objectives. Tr. 248-50. Students advance from one level to the next by consistently achieving nearly all of their behavioral/social goals for a specified period of time, and each level of the token economy affords students with greater independence and greater responsibility for monitoring their own behavior. Tr. 249-51. After advancing through each level of the token economy, students enter the next phase of the behavioral program, which is described as the "self-dependent process" or "self-dependent program," in which they learn to identify their own triggers, maintain their own consequences, and identify replacement behaviors for problem behaviors. Tr. 251. The title of the program refers to the ultimate goal, and not to a student's capabilities upon entering the self-dependent phase of the program. Tr. 252-53. Dr. Queenan testified that the process of actually learning to be self-sufficient often requires a full academic year to two years from the time when a student first enters the "self-dependent" process. Tr. 252-53. Dr. Queenan testified that applied behavioral analysis, upon which the token economy is based, is the recognized best practice for dealing with students on the autism spectrum. Tr. 248, 254.

An updated clinical treatment plan created by Glenholme in late June 2009, with input from M.W. and A.W., indicates that A.W. had "made gains within the structure of the program and continue[d] to respond favorably to the structure of the program," P. Ex. G, at 1, but that she continued to struggle with "recogniz[ing] and utilize[ing] appropriate coping skills for handling things that don't go her way," communicating her needs in "emotionally charged situations," and appropriately interacting with adults and peers. *Id.* at 2-4. The treatment plan created by Glenholme included goals, and objectives within each goal, to address A.W.'s problems with coping skills, interpersonal relations, social skills, and "transfer of treatment." *Id.* The treatment plan includes family therapy for sixty minutes once a month, as well as individualized therapy for sixty minutes once a week. *Id.* at 1.

d. Testing

On April 30, 2009, the Glenholme school psychologist conducted a psycho-educational evaluation of A.W. at the request of the District's Planning and Placement Team. *See id.* at 1. The psychologist administered the Kaufman Assessment Battery For Children, Second Edition to assess the Student's cognitive functioning, and the Woodcock-Johnson III Normative Update Tests of Achievement ("W-J III") to assess the Student's academic functioning. *Id.* at 2-3. According to the report, A.W. exhibited average to above average cognitive functioning and average academic functioning overall; *id.*, however, A.W. performed in the below average range in the area of math achievement, which was described as "an area of significant difficulty" for the Student. *Id.* at 4. The results of the W-J III test revealed significant disparities in A.W.'s academic functioning. *Id.* at 3-4. For example, A.W. performed better than eighty-nine percent of same-age peers in the area of reading achievement, but performed better than only nine percent of same-age peers in the area of math achievement. *Id.* at 4.

Based on the results of the assessment, the school psychologist recommended, *inter alia*, teaching styles that "accent [A.W.'s] significant verbal comprehension skills," the consistent use of an assignment pad, planner or device to record daily assignments, providing A.W. with models and samples on tasks requiring visual/spatial relationship skills, and extended time (1.5) and access to a calculator for all mathematical tasks. *Id.* at 5. A.W.'s IEP for the 2008-2009 school year, which was in place prior to the April 30, 2009 evaluation, included recommendations for extended time (2.0) on all tests and the use of a calculator, among other testing accommodations. D. Ex. 7, at 3.

### 5. 2009-2010 School Year

#### a. CSE Annual Review Meeting

On May 20, 2009, the CSE convened for an Annual Review meeting to develop A.W.'s IEP for the 2009-2010 school year. *See* D. Ex. 8. The meeting was chaired by Heather Hendershot, Assistant to the Director of Special Education for the District. *Id.* at 1. The CSE also included a psychologist, a home/school liaison, a social worker/counselor, M.W. and A.W. *Id.* Sara Satalino, A.W.'s social worker at Glenholme, participated in the meeting via telephone, as did A.W.'s occupational therapist and a teacher from Glenholme. *Id.*

As a result of the discussion at the meeting, the CSE recommended continued classification as a student with a disability, and continued placement in Glenholme's twelve-month residential program with a 12:1:1 special class setting for academic courses, and related services of individual counseling and individual occupational therapy to continue at then-current levels. *Id.* at 2. The CSE also reviewed the testing accommodations and program modifications in effect and made minor changes in order to appropriately address the Student's needs for the 2009-2010 school year. *Id.* at 2, 3. The program modifications, testing accommodations and

related services recommended by the CSE were all provided to A.W. by Glenholme in accordance with the Student's IEP.  *See* Tr. 75-76, 259, 264-65; D. Ex. 10, at 2.

      b.  <u>Academic Performance</u>

A Glenholme report card for the first and second quarters of the 2009-2010 school year indicates that A.W. continued to receive grades of As and Bs for achievement in most of her classes, and that she received grades of As and Bs for effort in all of her classes.  *See* D. Ex. 18, at 1-2.  However, during the first quarter of the 2009-2010 school year, A.W. received a D for achievement in Academic Writing, and a C+ for achievement in Spanish III.  *Id.* at 1. Additionally, A.W., who was enrolled in the tenth grade, was receiving math instruction at a ninth grade instructional level, D. Ex. 9, at 1, and her math teacher reported that A.W. had a learning disability in math.  D. Ex. 10, at 4; *see also, e.g.*, Tr. 263-64.  For the second quarter of the 2009-2010 school year, A.W.'s grades for both effort and achievement improved or remained constant in nearly every subject as compared to the prior quarter.[7]  D. Ex. 18, at 2.

Teacher reports from March and April 2010 indicate that A.W. performed well academically in most of her classes for the remainder of her time at Glenholme, but that she continued to struggle with appropriately handling frustrations, as well as various other behavioral issues, which negatively impacted her academic performance in every subject.[8]  *See* D. Ex. 10, at 3-8.  Further, A.W. remained below grade level in math, continued to struggle in

---

[7] A.W.'s second quarter grades for both effort and achievement in English II were inferior to her first quarter grades, as were her grades for effort in math, and for achievement in chorus.  D. Ex. 18, at 2.

[8] For example, the Student's Writing teacher noted that, at times, A.W. was distracted by issues outside the classroom, which interfered with her work, and that A.W. needed to rely on the token economy to manage her behavior in class.  D. Ex. 10, at 6.  A.W.'s Spanish teacher wrote that she "can get overly social and inappropriate at times," and "needs close supervision and support to finish her work."  *Id.* at 8.

Spanish III, and exhibited a significant decrease in motivation and effort in an online

"Peacemaking" course. *Id.* at 4, 7, 8.

     A Glenholme Progress Report for IEP Goals, which corresponds to the annual goals in

the Student's 2009-2010 IEP, indicated that, as of the third quarter of the 2009-2010 school

year, A.W. had achieved one of her annual goals in the area of Study Skills, and had made

some, or satisfactory, progress with respect to her other three Study Skills annual goals and her

one annual goal in the area of Reading. *See* D. Ex. 13, at 1-2. A.W. had also achieved her one

annual goal in the "Motor" category, and both of her annual goals in the

"Career/Vocational/Transitional" area. *Id.* at 3.

     c.  <u>Behavioral Progress</u>

     The Glenholme Progress Report for IEP Goals also indicated that A.W. had made some,

or satisfactory, progress with respect to five of the six annual goals in her IEP in the

"Social/Emotional/Behavioral" area. *Id.* at 2-3. With respect to the sixth annual goal,

displaying appropriate coping skills to deal with changes or disappointments, A.W.

demonstrated some progress during the first two quarters of the school year, but was "not

progressing satisfactorily" during the third quarter of the school year. *Id.* at 2.

     During an April 26, 2010 CSE meeting, which is discussed further below, A.W.'s social

worker reported that the Student was "continuing to work on increasing her frustration

tolerance and implementing coping skills," but that she had "made excellent behavioral

progress and [was] functioning at a Self-Directed level in the program's behavioral

component." D. Ex. 9, at 1-2; P. Ex. E, at 1. Despite A.W.'s significant improvement with

respect to the problematic behaviors for which she was initially placed at Glenholme, D. Ex.

10, at 1; Tr. 68, 105-06, 162-63, 265-67, 270, 615-16, the Student continued to exhibit

"behaviors of treatment concern" during the 2009-2010 school year up until the time of her withdrawal from Glenholme in late April 2010.  *See* D. Ex. 10, at 1; P. Ex. W; Tr. 104, 260-61, 267-68.  Specifically, at the time of her withdrawal, A.W. was exhibiting "extreme emotional reactivity to minor events, [] not accepting responsibility for these reactive behaviors," D. Ex. 10, at 1, not handling frustrations appropriately, P. Ex. AA, and—according to Glenholme and District personnel—A.W. continued to benefit from the behavioral program and supportive, therapeutic environment offered by Glenholme.  *See, e.g.*, *id.*; Tr. 68-69, 78, 260-61, 267-68.

      d.  <u>M.W.'s Concerns about Glenholme</u>

     Despite A.W.'s undisputed academic and behavioral progress at Glenholme during the first three quarters of the 2009-2010 school year, M.W. had concerns about the administration of A.W.'s asthma medication,[9] and about the "restrictiveness" of Glenholme's behavioral program.  *See, e.g.*, Tr. 533-37.  As a result, in early November 2009, M.W. requested a meeting with Dr. Patrick Queenan, the Assistant Director of Glenholme and a psychologist.  Tr. 533.  Prior to the meeting, M.W. sent a list of questions via email to Sara Satalino, A.W.'s social worker at Glenholme,[10] regarding topics that M.W. wanted to discuss with school personnel.  P. Ex. L.  The email includes questions about Glenholme's plans for A.W.'s behavioral treatment plan going forward, as well as her preparedness to transition to a "less restrictive" environment for the subsequent school year.  *Id.*

---

[9] Email communications in the administrative record indicate that M.W. complained to Glenholme personnel on numerous occasions after A.W. reported that she was not receiving her asthma medications as frequently as necessary, or that her medications were not provided immediately upon request.  *See, e.g.*, P. Exs. I, J, K, M, V, BB, CC, EE, FF, II; *see also* D. Ex. 10, at 2; D. Ex. 11, at 2.  At some point during the 2009-2010 school year, M.W. filed a complaint against Glenholme with the State of Connecticut Department of Children and Families ("DCF") relating to the administration of A.W.'s asthma medication.  Tr. 268-69; *see also* P. Ex. EE.  After an investigation by DCF, the complaint was dismissed as unsubstantiated.  Tr. 268; *see also* Tr. 641-42.

[10] Satalino was A.W.'s social worker from November 2008 until the time she left Glenholme. Tr. 740.  Satalino was M.W.'s primary contact at Glenholme throughout the relevant time period.

The early November meeting was attended by M.W., a woman by the name of Brenda
Terwilliger who accompanied the Parent to the meeting, Queenan, Sara Campbell, Glenholme
headmaster, and other school personnel who M.W. could not specifically recall.  Tr. 538.
According to M.W., when she asked Queenan whether A.W. would be given greater
independence and freedom through Glenholme's behavioral program, he responded that she
would not.  Tr. 538-40.  The Parent was dissatisfied with Queenan's response to that question,
and to his responses to her questions about how Glenholme was preparing A.W. for "the real
world" and about the administration of her asthma medication.  Tr. 537-39, 540-41, 549.  As a
result of the discussion that took place at the meeting, M.W. concluded that Glenholme was
"no longer appropriate" for her daughter, Tr. 540, and she began to consider other schools for
A.W., including Franklin.  Tr. 541, 546.

Prior to January 12, 2010, the District attempted to schedule a CSE meeting with the
Parent for the week of February 15, 2010 in order to discuss the appropriateness of A.W.'s
continued placement at Glenholme.[11]  *See* P. Ex. X.  By email dated January 12, 2010, M.W.
advised the District that she had scheduled a neuropsychological evaluation for A.W. to begin
at the end of January, and requested that the CSE meeting be rescheduled to a later date when
the results of the evaluation would be available.  *Id.*  In response, the District agreed to
reschedule the CSE meeting to a date in March.  *Id.*

---

[11] It is not clear from the administrative record when M.W. first notified the District about her opinion that
Glenholme was no longer appropriate for A.W.  The Parent's testimony on this issue was contradictory and
confusing.  *Compare* Tr. 540, 547 *with* Tr. 676-78; *see also* Tr. 685.  Selena Fisher ("Fisher"), Director of Pupil
Personnel and Special Services for the District, testified that M.W. told her that she thought Glenholme had ceased
to be an appropriate placement for A.W. for the first time at some point after the beginning of 2010. Tr. 95.

e.  Private Neuropsychological Evaluation

During three nonconsecutive days in January 2010, Dr. Carolyn McGuffog ("McGuffog"), a clinical psychologist, conducted a neuropsychological evaluation of A.W. *See* D. Ex. 14; P. Ex. Y.[12]  McGuffog conducted a number of assessments to measure A.W.'s intellectual functioning, verbal ability, language processing skills, perceptual reasoning, working memory aptitude, memory and learning aptitude, processing speed, attention quotient, attentional regulation, academic achievement in specific subject areas, and behavioral problems.  *See* D. Ex. 14, at 2-9; P. Ex. Y, at 5-50.  McGuffog's conclusions regarding A.W.'s intellectual abilities and academic strengths and weaknesses were largely consistent with prior evaluations conducted by Glenholme and/or the District.  *See* D. Ex. 14, at 3-8; P. Ex. Y, at 2-36; *see also* Tr. 73-75, 103.

Regarding emotional-social functioning, McGuffog noted that, when A.W. is frustrated she "becomes oppositional and may lash out at others," and that "[w]hen her defenses break down, [A.W.'s] perceptions become inaccurate and she is inclined to misperceive the world around her and to misinterpret the intentions of others."  D. Ex. 14, at 9; P. Ex. Y, at 50. McGuffog also noted that A.W.'s "judgment becomes faulty which leads to inappropriate actions that further hamper social relationships," and that A.W. "tends to exert[] much less control over her emotions than most adolescents her age as she experiences and expresses affect in an overly dramatic manner."  D. Ex. 14, at 9; P. Ex. Y, at 50.  Results of projective testing revealed that A.W. exhibited "exaggerated concern around dependency/independency and separation/individuation issues," but that A.W. "feels most comfortable in highly structured and predictable situations."  D. Ex. 14, at 9; P. Ex. Y, at 50.

---

[12] The administrative record contains two versions of McGuffog's report:  a 72-page version, which was introduced as Parent Exhibit Y, and a 13-page summary version, which was introduced as District Exhibit 14.

McGuffog concluded that A.W.'s neurocognitive profile was highly consistent with a diagnosis of Nonverbal Learning Disability ("NLD").  D. Ex. 14, at 10; P. Ex. Y, at 57.  She noted that A.W.'s "emotional dysregulation appears to be secondary to neurocognitive deficits . . . ."  D. Ex. 14, at 10; P. Ex. Y, at 57.  In addition, McGuffog concluded that A.W. met the criteria for a diagnosis of Asperger's disorder, "as her history is revealing of qualitative impairment in her social interactions, multiple areas of intense, high interest, and inflexibility."  D. Ex. 14, at 10-11; P. Ex. Y, at 57.  McGuffog also diagnosed A.W. with Attention-Deficit/Hyperactivity Disorder, Combined Type," and noted that A.W. was at risk for a Generalized Anxiety Disorder.  D. Ex. 14, at 10-11; P. Ex. Y, at 58.

McGuffog recommended placement in "a residential program with expertise in working with students with a Nonverbal Learning Disability and/or Asperger's Disorder."  D. Ex. 14, at 11; P. Ex. Y, at 58.  McGuffog noted that A.W. "should not be placed in an environment with students whose primary disability is emotional, as many interventions that are appropriate for emotionally disabled students are inappropriate for a student whose disability is primarily neurologically based."  D. Ex. 14, at 11; P. Ex. Y, at 58.  McGuffog's report also includes a number of specific recommendations, such as the use of graphic organizers, verbal instruction in math, provision of class notes, and explicit, systematic instruction in mathematics and writing.  D. Ex. 14, at 11; P. Ex. Y, at 58.  Recommended testing accommodations included extended time, breaks, a small distraction-free environment, use of a word processor, and having math questions read out loud.  D. Ex. 14, at 13; P. Ex. Y, at 59-60.

McGuffog noted that A.W. "benefits from externally imposed structure and routines," and recommended that A.W. receive routines to assist with organization of daily activities.  D. Ex. 14, at 11-12; P. Ex. Y, at 58-59.  The report goes on to state that "in counseling, [A.W.]

needs to work on increasing her capacity for flexibility through a systematic desensitization

process," and that A.W. "need[ed] to learn systematic relaxation strategies to facilitate

emotional regulation."  D. Ex. 14, at 12; P. Ex. Y, at 59.  McGuffog also recommended that

A.W. receive "explicit instruction in social skills, as she is not intuitively able to interpret

social situations."  D. Ex. 14, at 12; P. Ex. Y, at 59.  Finally, she noted that "[A.W.'s] behavior

is better controlled through manipulating antecedents or 'triggers' rather than consequences."

D. Ex. 14, at 12; P. Ex. Y, at 59.

> f.   Events Leading up to A.W.'s Withdrawal from Glenholme

On January 23, 2010, prior to the completion of the private evaluation (and prior to the

CSE meeting with the District), M.W. and A.W. applied to Franklin Academy for the 2010-

2011 school year.  P. Ex. F, at 2-11; Tr. 562-63, 681-82.  In the written application, M.W.

indicated that she had retained a lawyer to represent her in seeking "continued monetary

support" from the District, because Franklin was not on the New York State list of approved

schools.  P. Ex. F, at 8.  The application materials include a school questionnaire and a teacher

recommendation, which was completed by A.W.'s math teacher at Glenholme on February 5,

2010.  *Id.* at 9-11.

By email dated March 9, 2010, M.W. notified Glenholme that she would be receiving

the results of the private neuropsychological evaluation at the end of that week.  P. Ex. AA.

The email, which the Parent sent to Satalino, states that the evaluation results would be

forwarded to Franklin as part of the admissions process, and that someone from Franklin would

be calling Glenholme to discuss A.W. once the results were received.  *Id.*  M.W. asked Satalino

to tell her what Glenholme would tell Franklin about her daughter.  *Id.*  Specifically, M.W.

wrote:  "I would like to know what Glenholme is thinking about [A.W.] before the CSE

meeting and before you say it to anyone else." *Id.* In a response sent the same day, Satalino explained that she would share with Franklin "the behaviors that we see," but that she would not share any information with Franklin that M.W. did not already know.[13] *Id.* In response to M.W.'s request for Glenholme's view of A.W. prior to the CSE meeting, Satalino wrote: "[t]he purpose of the CSE meeting is to determine what is best for [A.W.]," and therefore, Glenholme could not "make a recommendation in advance because we would base our recommendation on listening and responding to your input and the school districts [sic] input" at the CSE meeting. *Id.* In conclusion, Satalino encouraged the Parent "to set up the CSE [meeting] within the next several weeks so that [they could] have a discussion with everyone present." *Id.*

By email dated March 17, 2010, M.W. informed the District that the private neuropsychological evaluation report was "about ready" and inquired as to when the CSE would convene. P. Ex. DD. In response, Fisher wrote that she would contact the Parent with a CSE date once the District received the report, *id.*, in accordance with M.W.'s prior request. P. Ex. X. Fisher testified that the District received the summary version of McGuffog's report in March 2010. Tr. 67.

By separate email dated March 17, 2010, M.W. forwarded to Fisher an email exchange between herself and the Glenholme nurse regarding A.W.'s asthma medication, and, after requesting Fisher's "feelings and insights," M.W. wrote: "I have had it!" P. Ex. EE, at 2; *see also supra* note 9. During the impartial hearing, M.W. testified that this communication was

---

[13] In her March 9, 2010 response to M.W.'s email of the same date, Satalino also wrote: "As you know, we continue to see [A.W.] not handling her frustrations appropriately. We believe that she continues to benefit from a supported, therapeutic environment and responds well [to] the behavioral supports which include[] a motivational management system and [] accountability." P. Ex. AA.

the first time she had shared such a sentiment about Glenholme with District personnel.  Tr. 684-85.

The precise series of events that ultimately led the Parent to withdraw A.W. from Glenholme is not entirely clear from the administrative record.  The Parent testified that she made the decision to remove A.W. from Glenholme in the middle of the 2009-2010 school year because of a few unrelated disciplinary incidents in March 2010.[14]  *See, e.g.*, Tr. 552-55, 566-67; *see also* P. Ex. MM.  Fisher testified that M.W. informed her that she was seeking an alternative placement for A.W. because of her concerns relating to Glenholme's administration of A.W.'s asthma medication.  Tr. 69-70.

By email dated March 29, 2010, M.W. notified Glenholme that A.W. would not be returning to the school.  P. Ex. HH; *see also* D. Ex. 11.  By email dated April 6, 2010, Fisher replied to an email from M.W. which is not contained in the record by stating that the District had previously "attempted to schedule a CSE to review [A.W.'s] program with little success as the dates and times have not worked for you."  P. Ex. MM, at 2.  Fisher also wrote that the matter raised by the Parent in her prior email, which is not contained in the record, was an issue that needed to be reviewed at the CSE meeting.  *Id.*  Fisher told M.W. that someone from the District would contact her with another date and time for the CSE to convene.  *Id.*  In response, M.W. indicated that she was available to meet with the CSE during the next two days, but would thereafter be unavailable for a CSE meeting until April 20, 2010.  *Id.* at 1.  M.W.'s email also references her dissatisfaction with Glenholme, her beliefs about the type of

---

[14] Although the Parent also attributed her decision to withdraw A.W. from Glenholme to an unidentified school supervisor informing her, a few days after March 19, 2010, that they had already packed up A.W.'s entire room, Tr. 560-61, she subsequently testified that Glenholme packed up A.W.'s belongings at some point after she told Satalino via email that A.W. would not be returning to Glenholme.  Tr. 671; *see also* Tr. 269.  M.W.'s emails to Satalino are dated March 26, 2010 and March 29, 2010.  P. Ex. HH.

placement that would be appropriate for A.W., and her efforts to find a new placement for her

daughter.  *Id.*

By separate email dated April 6, 2010, in a message directed to the CSE, the Parent

informed the District that A.W. had been accepted at Franklin.  P. Ex. NN.  M.W. wrote: "If

you have found an appropriate placement for [A.W.] please notify me by the end of the week

so that I may visit and review its offerings.  If I do not hear back from you I will unilaterally

enroll [A.W.] in Franklin . . . ."  *Id.*  At the impartial hearing, M.W. testified that this email

communication was the first time she notified the District of her intention to unilaterally enroll

A.W. in Franklin.  *See* Tr. 660, 670.

By email dated April 7, 2010, the Parent's attorney contacted District counsel regarding

A.W.'s placement.  *See* D. Ex. 23.  The email communication states that Glenholme "is not

receptive to [A.W.] completing [the] 09-10 school year there," and that M.W. had asked Fisher

"to locate a different placement which is less restrictive yet is intensive and supervised," but

"to date, the district has not directed [the] parent to any programs . . . ."[15]  *Id.*  The April 7,

2010 email from the Parent's attorney also indicates that A.W. had been accepted at Franklin

commencing May 3, 2010, and requests, on behalf of M.W, that the District provide home

tutoring for A.W. until her enrollment at Franklin.[16]  *Id.*  In conclusion, the Parent's attorney

requested that the District convene a CSE meeting "as promptly as possible on or after April

19."  *Id.*

---

[15] The only evidence of any such request by the Parent in the administrative record is the email M.W. sent to Fisher the previous day.  P. Ex. NN.

[16] Although no such home instruction was provided between April 7, 2010 and April 26, 2010, M.W. testified that the District offered home tutoring for A.W. at some point between April 7, 2010 and May 3, 2010, and that she declined the services.  *See* Tr. 702-03.  M.W. also testified that the District offered home instruction after the April 26, 2010 CSE meeting, and that such services were again declined because A.W. was either attending Franklin or about to begin attending Franklin.  Tr. 698-99.  The IEP that was created at the April 26, 2010 CSE meeting for the balance of the 2009-2010 school year also indicates that home instruction was declined by the Parent.  D. Ex. 9, at 2.

By email dated April 9, 2010, Queenan notified the District that, M.W. had advised Glenholme that A.W. would not be returning to the school.  P. Ex. D, at 1.  Queenan's email indicated that Glenholme had not discharged A.W., and that Glenholme would follow any directions from the District with respect to whether A.W. should still be considered an enrolled student at Glenholme.  *Id.*; *see also* Tr. 269.  M.W. and her attorney were copied on Queenan's email to the District.  P. Ex. D.

By letter dated April 12, 2010, the District notified M.W. about a CSE Annual Review and Program Review meeting scheduled for April 26, 2010.  D. Ex. 21.  At some point prior to the CSE meeting, the District sent referral packets to schools in an effort to locate an alternative placement for A.W.  Tr. 88.  The record includes rejection letters from two schools, dated April 14, 2010 and April 20, 2010, based on each school's conclusion that it would not be an appropriate placement to meet A.W.'s needs.  *See* P. Exs. B, C.

On April 16, 2010, M.W. signed an enrollment contract with Franklin, and made a $14,000 tuition payment, for the balance of the 2009-2010 school year.  P. Ex. F, at 12, 15, 18.

      g.   2009-2010 Program Review and 2010-2011 Annual Review CSE Meeting

On April 26, 2010, the CSE convened for Program Review relating to the 2009-2010 school year, as well as an Annual Review for the 2010-2011 school year.  *See* D. Ex. 21; Tr. 581-82.  Meeting participants included Britta Rothschild, CSE Chairperson, David Cusick, Psychologist, Christina Escanio, Home School Liaison, Diane Lentino, Assistant Director, Fisher, the Parent, the Student, a family friend and a representative from the Parent's attorney's office.  D. Ex. 9, at 1; D. Ex. 22, at 1; P. Ex. E, at 1.  Satalino, Queenan, a Glenholme teacher

and a fourth Glenholme representative also participated in a portion of the meeting by telephone.[17]  D. Ex. 9, at 1; P. Ex. 22, at 1; P. Ex. E, at 1.

The CSE reviewed and discussed the results of a psychoeducational evaluation conducted by Glenholme on April 30, 2009, as well as the report of the private neuropsychological evaluation conducted in January 2010.  *See* D. Ex. 9, at 1-2; P. Ex. E, at 2; D. Ex. 22, at 2.  After discussing the results of each evaluation, the CSE agreed that A.W. continued to be eligible for classification as a student with a learning disability "due to continued weaknesses in the areas of Nonverbal Reasoning and Mathematics."  D. Ex. 9, at 1.

The CSE then discussed A.W.'s academic and behavioral progress at Glenholme during the 2009-2010 school year.  *Id.* at 1-2; P. Ex. E, at 1; *see also, e.g.*, Tr. 162-63.  A.W.'s teacher reported that she "does well within the structure of the classroom setting," but noted that A.W. was working on a ninth grade instructional level in math, and that she had shown inconsistent effort in a few of her classes.  D. Ex. 9, at 1; D. Ex. 22, at 1; P. Ex. E, at 1.  Satalino reported that A.W. was "continuing to work on increasing her frustration tolerance and implementing coping skills," and that "she ha[d] made excellent behavioral progress and [was] functioning at a Self-Directed level in the program's behavioral component."  D. Ex. 9, at 1-2; D. Ex. 22, at 1; P. Ex. E, at 1.

During the CSE meeting, the Parent shared her concerns about Glenholme's administration of A.W.'s asthma medication, and A.W.'s resulting anxiety.  D. Ex. 9, at 2; D. Ex. 22, at 1; P. Ex. E, at 1; *see also* Tr. 70.  M.W. also stated her belief that "her daughter's needs would be better met in a less behaviorally oriented residential program, which would assist her daughter in continuing to develop independent skills."  D. Ex. 9, at 2; D. Ex. 22, at 1; P. Ex. E, at

---

[17] Once it became clear that A.W. would not be returning to Glenholme, the Glenholme representatives' participation in the CSE meeting concluded.  *See* Tr. 332-34, 355-57.

1.  However, the Parent did not disagree with the discussion of A.W.'s continued academic and behavioral progress at Glenholme.  *See, e.g.*, Tr. 162-63; *see also* Tr. 70.

A "[d]iscussion ensued regarding a change in placement, resulting in Committee on Special Education recommendation for placement in a New York State approved residential program."[18]  D. Ex. 9, at 2; D. Ex. 22, at 1; P. Ex. E, at 1.  The CSE determined that "current levels of related services remain[ed] appropriate."  D. Ex. 9, at 2; D. Ex. 22, at 1; P. Ex. E, at 1.  The revised IEP for the 2009-2010 school year indicated that the CSE recommended that A.W. be placed on home instruction pending acceptance into such a school, but that the Parent declined the District's offer of home instruction.[19]  D. Ex. 22, at 1; P. Ex. 9, at 2; *see also supra* note 16.  Fisher testified that M.W. told the CSE that A.W. would be attending Franklin as of the following week.  Tr. 72.

> h.  <u>District Efforts to Locate an Appropriate Placement After The CSE Meeting</u>

On the afternoon of the April 26, 2010, the District continued its efforts to identify an appropriate alternative placement for A.W. by sending referral packets to four additional schools on the New York State approved list.  *See* P. Ex. A; Tr. 85.  By email dated April 28, 2010, two days after the CSE meeting, M.W. made an informal request for tuition reimbursement for A.W.'s unilateral placement at Franklin, and notified the District of her intention to initiate a Due Process Hearing.  P. Ex. KK, at 2; P. Ex. OO, at 2.  By reply email dated April 29, 2010, the District provided M.W. with a Due Process Request form.  P. Ex. OO, at 1.

---

[18] According to testimony offered at the impartial hearing, the "discussion" regarding a change in placement referenced in the IEP Comments was not a substantive discussion regarding the appropriateness of either Glenholme or Franklin, but rather referred to District's intention to send referral packets to schools on the New York State approved list.  Tr. 81-84, 97-98, 111-13.  No specific New York State approved schools were discussed at that time.  Tr. 578-79.

[19] The Court notes that the CSE did not making any changes to the Student's IEP for the 2009-2010 school year with respect to A.W.'s strengths, weaknesses, needs or goals, or to the recommended program modifications and testing accommodations.  *Compare* D. Ex. 9 *with* D. Ex. 8; *see also* Tr. 73-74.

i.   A.W.'s Enrollment at Franklin

A.W. began attending Franklin on May 3, 2010.  Tr. 192.  As noted above, M.W. had

signed an enrollment contract for the 2009-2010 school year and made a $14,000 tuition

payment on April 16, 2010.  *See* P. Ex. F, at 12, 15, 18.  On June 10, 2010, M.W. made a $2,500

tuition payment for the first session of Franklin's summer program.  *Id.* at 16.  On June 30, 2010,

M.W. made a $2,000 tuition payment for the second session of Franklin's summer program, and

also paid a $5,000 deposit and $17, 950 in tuition for the first quarter of the 2010-2011 school

year.  *Id.* at 17-18.

## III. Procedural History

### A. The Due Process Complaint

In a formal due process complaint notice dated May 12, 2010, M.W. requested an

impartial hearing and asserted that the District had "refused to identify and fund an appropriate

placement for [A.W.]."  IHO Ex. i, at 2.  As a proposed solution, M.W. requested reimbursement

for tuition and board at Franklin.  *Id.*  In an response dated May 10, 2010,[20] the District asserted

that it had refused to pay tuition for Franklin because:  (1) Glenholme remained an appropriate

placement for A.W.; (2) even if it were not, there were other New York State approved schools

at which A.W. might be appropriately placed; and (3) Franklin was not an appropriate placement

for the Student.  IHO Ex. ii, at 1-2.  The District also asserted that M.W. had "predetermined"

that Franklin was the only appropriate placement for her daughter, and that she did not cooperate

with the CSE process.  *Id.*

---

[20] According to Plaintiff's counsel, the District's Answer predates the Parent's Due Process Complaint, because the District responded to an earlier, informal request for a hearing by the Parent, and then subsequently requested that the Parent make a formal due process complaint.  Tr. 28-29.

### B. The IHO Hearing and Decision

The IHO conducted a hearing over five nonconsecutive days between August 31, 2010 and August 10, 2011.  *See* Tr. 1-755.  The District presented as witnesses:  (1) Selena Fisher, Director of Pupil Personnel and Special Services for the District, Tr. 59-122; (2) Britta Rothschild, CSE Chairperson, Tr. 136-71; (3) Dr. Patrick Queenan, Assistant Executive Director at Glenholme, Tr. 240-78, 304-57; and, as a rebuttal witness, Sara Satalino, A.W.'s social worker at Glenholme. Tr. 738-54.  The Parent and A.W. testified at the hearing, Tr. 171-240, 520-703, and also presented as witnesses:  (1) Rebecca Hays, Clinical Director at Franklin, Tr. 360-70, 453-74, and (2) Joule Bazemore, Learning Specialist at Franklin.  Tr. 370-452.  After the hearing, both parties submitted post-hearing briefs, upon which the IHO relied in making her decision.  *See* IHO Ex. iii, iv.

In an October 11, 2011 decision, the IHO found that the District had not offered A.W. a FAPE for the portion of the 2009-2010 school year that A.W. attended Franklin.  IHO Dec. at 14. With respect to the District's position that Glenholme was an appropriate placement, the IHO determined that Glenholme was not the placement recommended by the CSE at the April 26, 2010 meeting and further found that "there was no specific recommendation at the CSE meeting."  *Id.* at 14. The IHO went on to determine that, even if the CSE had recommended Glenholme at the April 26, 2010 meeting, the evidence in the record established that Glenholme no longer met A.W.'s needs.  *Id.* at 14-15.  The IHO based this determination on testimony offered by the Parent and the Student regarding:  (1) A.W.'s need for "greater independence in order to begin the transition from the protective environment of a therapeutic boarding school to the demands of post-secondary living," (2) the Student and Parent's dissatisfaction with the level of restriction in the Glenholme program, and (3) the Student and Parent's "increased perception"

that Glenholme was not properly meeting A.W.'s medical needs, which interfered with A.W.'s ability to participate in the program at Glenholme.[21]  *Id.*

With respect to the 2010-2011 school year, the IHO held that the District failed to offer A.W. a FAPE because the CSE did not meet or develop an IEP for the Student, home instruction was not provided and an appropriate residential placement was not recommended.  *Id.* at 15. Finally, the IHO found that M.W. met her burden of proving that Franklin was an appropriate placement, and that equitable considerations did not preclude an award of full tuition reimbursement.  *Id.* at 15-25.

## C. The SRO's Decision

The District timely appealed the IHO's decision to the SRO and, on December 15, 2011, the SRO issued his decision overruling the IHO's decision, in part.  The SRO reversed the IHO's decision that the District denied A.W. a FAPE for the part of the 2009-2010 school year that A.W. attended Franklin and the IHO's decision that Franklin was an appropriate placement for the Student.  SRO Dec. at 11, 20.  The SRO affirmed the IHO's decision that the District denied A.W. a FAPE for the 2010-2011 school year on the ground that the CSE had not recommended an appropriate residential placement for the Student after the April 26, 2010 CSE meeting.  *Id.* at 15-16, 20.

### 1.  2009-2010 School Year

The SRO found that the District "provided personalized instruction with sufficient support services to permit the student to benefit educationally during the period of time that the student attended Glenholme for the 2009-10 school year and that the parents' [sic] removal of the student from Glenholme in March 2010 prevented the district from providing such

---

[21] For this last point, the IHO also relied on email communications sent by M.W. that were part of the administrative record.  IHO Dec. at 25.

instruction and services for the remainder of the 2009-10 school year." *Id.* at 11; *see also id.* at 14-15. The SRO also noted that "although the student's mother requested home instruction after she removed the student from Glenholme, and the CSE recommended home instruction pending acceptance of the student into an appropriate residential placement, home instruction was declined" by the Parent. *Id.* at 11.

The SRO concluded that Glenholme had appropriately addressed A.W.'s needs in the areas of social/emotional functioning, behavior, nonverbal reasoning, math and processing speed. *Id.* at 12. First, the SRO noted that the services provided by Glenholme were consistent with the recommendations of the private evaluator who assessed A.W. in January 2010. *Id.* Second, with respect to A.W.'s specific academic and behavioral needs, the SRO noted that A.W. performed well academically, that A.W.'s behavior had improved significantly while at Glenholme, and that A.W. was provided with the accommodations listed in her IEP relating to her difficulties with math and processing speed. *Id.* at 12-14. Third, the SRO found that the program at Glenholme was designed to provide A.W. with preparation for further education, employment and independent living. *Id.* at 13.

The SRO further found that the hearing record did not support the IHO's determination that the environment at Glenholme was too restrictive for the Student, because the evidence established that A.W. was still at the beginning of the self-dependent process and continued to exhibit behaviors of concern, which were being appropriately addressed by Glenholme immediately prior to her withdrawal. *Id.* at 13-14. With respect to the IHO's reliance on the Parent and Student's "increased perception" that Glenholme was not properly meeting A.W.'s medical needs, the SRO found that the evidence in the hearing record showed that an investigation conducted by the Connecticut Department of Children and Families resulted in a

determination that M.W.'s complaints were unsubstantiated.  *Id.* at 14.  The SRO also found that

Glenholme never advised that A.W. could not return to the school after her removal by M.W.  *Id.*

Accordingly, the SRO held that the District had offered A.W. a FAPE for the entirety of

the 2009-2010 school year, which the parent effectively declined by making the unilateral

decision in March 2010 to withdraw A.W. from Glenholme, and to thereafter demand (and then

decline) home instruction for her daughter.  *Id.* at 14-15.  Accordingly, M.W. was not entitled to

tuition reimbursement for the 2009-2010 school year.  *Id.*

### 2.  2010-2011 School Year

#### a.  FAPE

The SRO concluded that the hearing record supported the IHO's finding that the District

did not provide the Student with a FAPE for the 2010-2011 school year, because the CSE failed

to make a recommendation regarding A.W.'s placement in a residential setting after the April 26,

2010 CSE meeting.[22]  *Id.* at 15.

#### b.  Appropriateness of Franklin

Having found that the District denied A.W. a FAPE for the 2010-2011 school year, the

SRO went on to consider the IHO's finding that M.W. met her burden of proving that Franklin

was an appropriate placement for A.W.  *Id.* at 16-19.  The SRO concluded that, while A.W.'s

profile was generally consistent with a majority of students enrolled at Franklin, the hearing

record did not support a finding that Franklin provided educational instruction specially designed

to meet the unique needs of the Student.  *Id.* at 17.  Accordingly, the SRO held that Franklin was

---

[22] The District did not cross-appeal any portion of the SRO's decision; therefore, the SRO's determination that the District denied A.W. a FAPE for the 2010-2011 school year is a final decision.  *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 279.12(a).

not an appropriate placement for A.W. for the 2010-2011 school year, and therefore the Parent was not entitled to tuition reimbursement.  *Id.* at 20.

i)   Academic Needs

First, the SRO found that A.W. did not receive educational instruction specially designed to meet her unique needs in math, which was "an area of academic deficit."  *Id.* at 17.  As a specific example of Franklin's failure to provide such instruction, the SRO relied on a progress report for the third quint of the 2010-2011 school year, which showed that A.W. received a grade of "no credit" and "unsatisfactory" in Applied Math I.  *Id.*  The SRO noted that, after A.W. was unable to utilize the suggested strategies for coping with her math deficiencies and anxieties, there was no evidence in the hearing record of any additional strategies being implemented when A.W. was unable to perform academically or to cope with her anxiety in math class.  *Id.*  The SRO also noted that, as a result of her unsatisfactory performance in Applied Math I, A.W. was placed in a less demanding consumer math class during quint four of the 2010-2011 school year.  *Id.*  After comparing A.W.'s performance in the less demanding consumer math class to her performance in a more challenging math class at Glenholme during the prior school year, the SRO concluded that "rather than provid[ing] the student with educational instruction specially designed to meet the student's unique needs in math, including accommodations and modifications within the Applied Math I class, the student was moved to a lower level math class."  *Id.* at 18.

Second, the SRO found that the grading system at Franklin did not provide an objective means to measure A.W.'s progress at the school, because the progress reports did not contain sufficient information from which to gauge the degree of A.W.'s progress.  *Id.*  In support of this conclusion, the SRO identified various examples within the Franklin progress reports and skills

assessment reports that demonstrated the lack of sufficient information to determine whether A.W. had made educational progress while enrolled at the school. *Id.* at 18-19. Additionally, the SRO noted that A.W. continued to demonstrate significant difficulties with social/emotional functioning at Franklin, which negatively affected her academic progress. *Id.* at 19. Accordingly, the SRO found that that hearing record did not adequately demonstrate that A.W. had made academic progress while at Franklin. *Id.*

  ii) <u>Social-Emotional Needs</u>

  The SRO also found that Franklin did not appropriately address A.W.'s needs in the areas of emotional functioning, social skills or behavior. *Id.* First, the SRO noted that A.W. was placed back on psychotropic medications while enrolled at Franklin, despite having discontinued the use of such medication several years prior to her withdrawal from Glenholme. *Id.* Second, the SRO found that Franklin did not provide A.W. with individual counseling on a weekly basis. *Id.* Third, the SRO found that A.W. did not have individual goals in the area of social/emotional functioning while at Franklin. *Id.* Fourth, the SRO found that while A.W.'s teachers at Franklin had provided "some strategies for the student with minimal success, [they] did not modify []or develop additional strategies based on the student's needs and performance in class." *Id.* at 19. The SRO noted that "despite identifying the student's emotional/social functioning as a significant area of need, the evidence does not show that Franklin appropriately addressed the student's needs" in that area. *Id.* Based on his review of the administrative record, the SRO found that during the 2010-2011 school year, A.W.'s "lack of emotional regulation" negatively affected her academic performance, as well as her interactions with others. *Id.* Therefore, the SRO concluded that the IHO's finding that M.W. met her burden of proving that Franklin was appropriate for A.W. was not supported by the hearing record. *Id.* at 19-20.

Having found that Franklin was not an appropriate placement for the Student, the SRO did not address the IHO's decision that equitable considerations favored the Parent's claim for tuition reimbursement.  *Id.* at 20.

## IV. Discussion

### A. Standard of Review

#### 1.  IDEA

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(C)(i-ii).  Though IDEA appeals tend to come before the district court as motions for summary judgment, *see, e.g.*, *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006), the existence of a genuine issue of material fact does not necessarily result in denial of the motions.  *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, a motion for summary judgment in the IDEA context is more akin to an appeal from an administrative determination. *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (citing *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).  Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by a preponderance of the evidence, taking into account the record from the administrative proceedings and additional evidence presented to the district court by the parties. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (citation omitted). However, in conducting this review, the court may reject factual findings which are not supported, or are controverted, by the record.  *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011) (citation omitted).

The rulings of the IHO and the SRO are subject to "independent" judicial review; however, a federal court's role in reviewing state educational decisions under the IDEA is "circumscribed," as "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 112-13 (citation and internal quotation marks omitted).  Upon independently reviewing the administrative record, the court must make a determination based upon a preponderance of the evidence, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at  206.  Rather, the federal courts must accord "substantial deference" to such findings. *Cerra*, 427 F.3d at 191.  Furthermore, district courts should abstain from making "subjective credibility assessments." *M.H.*, 685 F.3d at 240 (quoting *Grim*, 346 F.3d at 383) (internal quotation marks omitted).

As the Second Circuit has recently articulated, the district court's analysis of the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* at 244.  That being said, the court's "determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role," and "courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding." *Id.*  For example, district courts should afford more deference to administrative findings regarding the substantive adequacy of an IEP than to determinations addressing whether an IEP was developed according to the proper procedures.  *Id.* (citing *Cerra*, 427 F.3d at 195).

District courts are also directed to show greater deference to an administrative determination when "its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *Id.*

Finally, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Gagliardo*, 489 F.3d at 113 n.2). Therefore, courts "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* (citation and internal quotation marks omitted); *see also Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007) (deferring to the SRO's determination, which was contrary to the determination of the IHO, because doing otherwise would entail "substituting [the court's] own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so, in violation of the law in this Circuit."), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) "However, when [] the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO," the court may then "consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than [] rely[ing] exclusively on its own less informed educational judgment." *M.H.*, 685 F.3d at 246.

## 2.  Claims for Tuition Reimbursement

If a state receiving IDEA funding fails to provide a disabled child with a FAPE, the child's parents may remove the child to an appropriate private school and then seek tuition reimbursement from the state. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009); *see also C.L. v. N.Y.C. Dep't of Educ.*, 12 Civ. 1676 (JSR), 2013 WL 93361, at *2 (S.D.N.Y. Jan.

3, 2013).  Generally, tuition reimbursement for private placement is warranted if:  (1) the IEP proposed by the school district was inappropriate and (2) the private placement was appropriate to the child's needs.  *Sch. Comm. of Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 370 (1985); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006).  However, even if these two requirements are satisfied, the court retains discretion over whether to award tuition reimbursement.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added).  "Moreover, because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'"  *Frank G.*, 459 F.3d at 363–64 (quoting *Burlington,* 471 U.S. at 374) (alteration in original).  Courts also retain discretion to reduce the amount of a reimbursement award if warranted by the equities; for example, if the parents failed to provide the school district with adequate notice of their intent to enroll their child in a private school.  *Forest Grove,* 557 U.S. at 247.

"Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate, even if the proposal in the IEP is inappropriate."  *Frank G.*, 459 F.3d at 364.  Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement."  *Id.* (citations omitted).  "Ultimately, the issue turns on whether a placement [] is reasonably calculated to enable the child to receive educational benefits," which means it is "likely to produce progress, not regression."  *Id.* (citations and internal quotation marks omitted).  In undertaking this analysis, "[n]o one factor is necessarily dispositive," *id.*, and the main question is whether the private

placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *M.H.*, 685 F.3d at 246 (quoting *Gagliardo,* 489 F.3d at 115) (emphasis in original) (internal quotation marks omitted); *see also Frank G.*, 459 F.3d at 364 ("[C]ourts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.") (citation omitted).

"A court may consider a student's progress in a private placement setting, but the Second Circuit has made clear that the focus must remain on whether the placement satisfies the student's unique needs." *Weaver*, 812 F. Supp. 2d at 523. "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit," *Frank G.*, 459 F.3d at 364, but academic success in a private placement setting alone is not enough. *Weaver*, 812 F. Supp. 2d at 523 (citation omitted). Accordingly, "even where there is evidence of success in the private placement, courts should not disturb a state's denial of IDEA reimbursement where the chief benefits of the chosen school are the kind of advantages that might be preferred by parents of any child, disabled or not." *M.H.*, 685 F.3d at 246 (citation and internal quotation marks and alterations omitted).

The Court notes that the standard applied to a parent's private placement is less stringent than that imposed on school authorities when assessing whether the state provided a student with a FAPE. *Weaver*, 812 F. Supp. 2d at 523 (citations omitted). "To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Frank G.*, 459 F.3d at 365 (citation omitted). Rather, the parents must show that the "placement provides 'educational instruction specially designed to meet the unique educational needs of a handicapped child, supported by such

services as are necessary to permit the child to benefit from instruction.'"  *Id.* (quoting *Rowley*, 458 U.S. at 188-89).

**B. The SRO's Decision Merits Deference**

Plaintiff asserts that the SRO's decision is not entitled to deference from this Court because the SRO:  (1) "ignored the IHO's numerous credibility assessments," and (2) "ignored and reversed the IHO's credibility assessments and fact-findings and [] substituted his own credibility determinations of those for the IHO" without any basis for doing so.  Pl.'s Mem. Law Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") 6, Doc. 11; *see also id.* at 14-15;  Pl.'s Reply Mem. Law Supp. Pl.'s Mot. Summ. J. ("Pl.'s Reply Mem.") 4, 6, Doc. 29; Pl.'s Mem. Law Opp. Def.'s & Further Supp. Pl.'s Mot. Summ. J. ("Pl.'s Opp.") 6, 7, Doc. 23.  However, Plaintiff fails to identify a single instance in which the SRO either credited testimony that the IHO had discredited, or discredited testimony credited by the IHO.  Rather, the situation here is simply the commonplace occurrence where the IHO and SRO reviewed the same testimony and drew differing conclusions.  This "does not mean that the SRO improperly ignored the IHO's determinations, or that the SRO's review was not thorough and careful."  *C.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 0157 (LTS), 2011 WL 5130101, at *8 (S.D.N.Y. Oct. 28, 2011) (citing *R.R. v. Scarsdale Union Free Sch. Dist.,* 366 F. App'x 239, 242 (2d Cir. 2010)); *see also S.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 870 (DLC), 2011 WL 5419847, at *15 (S.D.N.Y. Nov. 9, 2011) (finding that there was no credibility dispute where the SRO did not make a determination as to the veracity of the parents' testimony because "[t]he conflict here is not which side is truthful. Rather, it is a disagreement about educational policy and the legal obligations of the [District] under the IDEA, an area in which the SRO is accorded deference.").

Moreover, deference to the SRO is particularly appropriate where, as here, the SRO conducted a thorough review of the entire record that was before the IHO and clearly explained the bases for his conclusions.  *Walczak*, 142 F.3d at 129 ; *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 137 (S.D.N.Y. 2006).  While Plaintiff repeatedly urges the Court to disregard the SRO's decision in favor of the decision of the IHO, *e.g.*, Pl.'s Mem. 6, 10-12, 14-15; Pl.'s Reply Mem. 4-6; Pl.'s Opp. 6, 7, the case law in this Circuit clearly directs the district court to afford an IHO's decision *diminished* weight when it is contradicted by a well-reasoned decision by the SRO that is supported by the evidence in the record.  *See A.C. ex rel. M.C.*, 553 F.3d at 171 (explaining that courts "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." (citation and internal quotation marks omitted)).

**C. 2009-2010 School Year**

**1.  FAPE**

In opposing the SRO's holding that the District provided A.W. with a FAPE for the entirety of the 2009-2010 school year, Plaintiff argues that the SRO "exceeded the scope of his authority" by "conduct[ing] an unbounded 'review' of the record," rather than focusing on his review on the IEP created for the balance of the school year at the April 26, 2010 CSE meeting. Pl.'s Mem. 11-12.  However, contrary to Plaintiff's unsupported contention, a comprehensive review of the record is what the law *requires* an SRO to do when reviewing the findings and decision of the IHO.  *See* 34 C.F.R. § 300.514(b)(2)(i) ("The individual conducting the review must . . . examine the entire hearing record . . . "); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 279.10(b) ("The [SRO] may seek additional oral testimony or documentary evidence if the

[SRO] determines that such additional evidence is necessary.").  Indeed, Plaintiff explicitly notes this requirement in her motion papers.  *See* Pl.'s Mem. 7 (citing 34 C.F.R. § 300.514(b)).

Plaintiff also argues that the SRO erred by "reach[ing] a conclusion that the CSE itself had not reached, i.e. that Glenholme continued to be appropriate for A.W. for the remainder of the 2009-2010 school year."  Pl.'s Mem. 12.  However, this argument is based on an inappropriately narrow view of the record that fails to acknowledge the chronology of the underlying events.  When the CSE convened for A.W.'s Annual Review for the 2009-2010 school year, the Committee recommended that the Student continue in her placement at Glenholme.  D. Ex. 8, at 2.  Therefore, contrary to Plaintiff's assertions and the IHO's decision, the CSE *did* determine that Glenholme was an appropriate placement for A.W. for the 2009-2010 school year, *id.* at 1-2, and there is no indication that the CSE made any changes to its recommendation prior to the Parent's decision to unilaterally withdraw A.W. from Glenholme on March 29, 2010.  Nor did the CSE's recommendation change prior to the Parent's unilateral placement of A.W. in Franklin on April 16, 2010.  *See* P. Ex. F, at 12, 15, 18.  By the time the CSE was able to convene for a Program Review on April 26, 2010, after a delay that was at least partly attributable to the Parent's unavailability between April 9, 2010 and April 19, 2010, P. Ex. MM, A.W. had been out of school for almost a month and M.W. had already signed the Franklin enrollment contract and made a $14,000 tuition payment for the balance of the 2009-2010 school year.  P. Ex. F. at 12, 15, 18.  M.W. conveyed this information to the CSE at the April 26, 2010 meeting, as well as her refusal to send A.W. back to Glenholme, Tr. 72, 74, 162, which is why the CSE made a recommendation of home instruction pending placement in a New York State approved residential program, rather than futilely re-recommending continued placement at

43

Glenholme notwithstanding the reality of the circumstances with which the CSE was confronted on April 26, 2010.[23]  Tr. 74-75.

Plaintiff also argues, in opposing Defendant's motion for summary judgment, that the District's current contention that Glenholme remained an appropriate placement for A.W. is contrary to the District's position at the time of the April 26, 2010 CSE Meeting.  Pl.'s Opp. 4. However, Plaintiff's suggestion that the CSE deemed Glenholme inappropriate for the Student at the April 26, 2010 CSE Meeting is directly contradicted by the credible and undisputed testimony offered by Fisher and Rothschild at the impartial hearing.  *See* Tr. 74, 162.

While Plaintiff did not actually challenge the substance of the SRO's decision that Glenholme remained an appropriate placement for A.W. for the portion of the 2009-2010 school year that she attended Franklin, the Court notes that the SRO's decision in this regard is adequately supported by the record.  SRO Dec. at 11-15.

**D. 2010-2011 School Year**

As noted above, the only question before this Court relating to the 2010-2011 school year is whether Franklin was an appropriate placement for the Student.  On this issue, Plaintiff bears the burden.  *Frank G.*, 459 F.3d at 364.  A district court's review of an SRO's decision regarding the appropriateness of a parental placement is limited to an examination of objective evidence indicating whether the child is likely to make progress or regress.  *See id.* (applying objective evidence standard to determine whether a parent's placement of a child in a private school was appropriate).

---

[23] Plaintiff's assertion that the SRO improperly considered "predetermination" in deciding that the District provided A.W. with a FAPE, and that such a consideration was an error of law, Pl.'s Reply Mem. 3-4, is without merit.  There was nothing improper in the SRO's consideration of the events preceding the April 26, 2010 CSE meeting. Moreover, the SRO held that the District provided A.W. a FAPE for the entirety of the 2009-2010 school year because he found that Glenholme remained an appropriate placement for the Student, SRO Dec. 11-15, not—as Plaintiff contends—because of any conduct on the part of the Parent.

In arguing for reversal of the SRO's finding that Franklin was not an appropriate placement for A.W., Plaintiff argues that the SRO improperly applied the *prospective* test set forth by the Second Circuit.  Pl.'s Mem. 13, 15.  However, as Plaintiff concedes in her Reply Memorandum, Pl.'s Reply Mem. 5 n.2, the test for determining the appropriateness of a parental placement is not solely prospective.  Rather, the Court must examine the record for *any* objective evidence as to whether the child was likely to make progress in the parent's unilateral placement.  In this regard, "[g]rades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit . . . ."  *Frank G.*, 459 F.3d at 364; *see also id.* ("Although it is more difficult to assess the significance of grades and regular advancement outside the context of regular public classrooms, these factors can still be helpful in determining the appropriateness of an alternative educational placement.") (citation omitted).

Second, Plaintiff argues that the SRO "ignored the factual findings of the IHO . . . and, instead, based his decision to reverse the IHO's [] decision primarily upon his judgment of the efficacy of the Franklin program."  Pl.'s Mem. 14-15.  However, as noted above, Plaintiff does not identify a single factual finding of the IHO that the SRO ignored.  Plaintiff also argues that the SRO erred by "relying substantially on A.W.'s specific behaviors, while completely disregarding other record evidence relied upon by the IHO . . . ."  *Id.* at 15.  Yet again, Plaintiff does not identify a single piece of record evidence relied on by the IHO that was ignored by the SRO.  With respect to Plaintiff's assertion that the SRO erred by "relying substantially on A.W.'s specific behaviors," the Court first notes that Plaintiff's argument is undermined by her assertion on the previous page that the CSE recommended a residential placement for A.W. "because of her behaviors . . . ."  *Id.* at 14.  Plaintiff also fails to offer any explanation as to why it was error for the SRO to "rely[] substantially on A.W.'s specific behaviors."  *Id.* at 15.

Moreover, Plaintiff's assertion misrepresents the SRO's decision, which contains a significantly longer discussion of A.W.'s academic needs, SRO Dec. at 17-19, than it does of her behavioral problems.  *Id.* at 19.   Further, the record evidence supports the SRO's finding that Franklin did not appropriately address A.W.'s behavioral needs.  *Id.*  Indeed, Joule Bazemore, the learning specialist at Franklin, expressly conceded:  "[w]e don't do behavior plans, that's not what we do here."  Tr. 407.

The balance of Plaintiff's papers consist of assertions offered in support of her request that "the Court find that the credibility determinations and reasoning of the IHO – more so than the reasoning of the SRO – are deserving of deference."  Pl.'s Mem. 15; *see also* Pl.'s Reply Mem. 6; Pl.'s Opp. 5-7.  "Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination," unless "the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference . . . ."  *M.H.*, 685 F.3d at 246.  Plaintiff has not identified a single way in which the SRO's decision is insufficiently reasoned or inadequately supported to merit deference from this Court.[24]

In opposing Defendant's motion for summary judgment, Plaintiff points to the testimony of Fisher and to the recommendations contained in McGuffog's report to support her position that Franklin was an appropriate placement for A.W.  Pl.'s Opp. 6-7.  Fisher's testimony that

---

[24] Plaintiff's Reply Memorandum contains additional challenges to specific findings in the SRO's decision regarding the appropriateness of the parental placement, Pl.'s Reply Mem. 5-6, in response to assertions in the District's opposition papers that the SRO's decision is entitled to deference from this Court.  Because Plaintiff asserts these arguments for the first time in her reply memorandum, the Court need not consider them in deciding Plaintiff's motion for summary judgment.  *Playboy Enters., Inc. v. Dumas,* 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (collecting cases) (citations omitted); *see also United States v. Yousef,* 327 F.3d 56, 115 ("We will not consider an argument raised for the first time in a reply brief.") (citations omitted).  In any event, the additional arguments are entirely meritless and would not change the Court's conclusion.

Franklin was "viewed as being the school for students who have a non-verbal learning disability . . . and also [for] children who were on the [autism] spectrum," Tr. 101, merits little weight, as Fisher testified that she did not have any personal knowledge or experience with Franklin in response to a question only moments earlier. *Id.* Additionally, Fisher's testimony does not call into question any aspect of the SRO's decision, because the SRO recognized that A.W.'s "profile is consistent with the majority of students enrolled at Franklin (non-verbal learning disability and/or Asperger's diagnosis)." SRO Dec. at 17. Plaintiff also does not identify any recommendations in McGuffog's report that the SRO overlooked or misconstrued. Indeed, the SRO's decision contains a detailed discussion of both the full and summary versions of McGuffog's report. *Id.* at 3-6. Plaintiff also does not identify any evidence in the record to support her contention that Franklin's program was consistent with McGuffog's recommendations. Pl.'s Opp. 7.

Finally, the Court notes that notwithstanding the SRO's decision that the hearing record did not contain sufficient evidence to support a finding that A.W. progressed at Franklin, SRO Dec. at 18-19, or to support a finding that Franklin was an appropriate placement for the Student, *id.* at 17, Plaintiff did not seek to introduce any additional evidence in the instant proceedings. 20 U.S.C. § 1415(i)(2)(C)(ii) (requiring courts to hear additional evidence at the request of a party).

The SRO's finding that Franklin was not an appropriate placement for A.W., which is well-reasoned, logical, and supported by the hearing record, merits deference. *See M.H.*, 685 F.3d at 244-46 (explaining that courts afford the most deference to substantive administrative findings that are grounding in thorough and logical reasoning) (citation omitted).

47

**V. Conclusion**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 10, 14, and to close this case.


It is SO ORDERED.


Dated:     June 12, 2013
           White Plains, New York

                                              Edgardo Ramos, U.S.D.J.